Illinois Appellate Court Fifth Division is now in session. I'll just guide and tell you the board is presiding. Good afternoon. Please be seated. Clerk will call the roll, please. 1-22-0898. Annard v. Municipal Officers of the Village of Dolton. Thank you. Good afternoon everyone and welcome to the First District Appellate Court Fifth Division. There are no pictures allowed in the courtroom at all. Please put your cameras away. Also no recordings. Thank you. Marshall, are we good? Yes, Your Honor. Thank you. Would the parties who are going to argue step up and introduce themselves. For the Municipal Officers, Burton S. Olson and Michael Kasper, KASPER, on behalf of the FLE. Thank you, Your Honor. I can assume the State's Attorney is not going to argue. Is there an ASA here? All right, thank you. We're going to allow 20 minutes per side as per the Supreme Court rules. We'll allow an extra five minutes for a reply. Please remember that the panel has read the briefs and is very familiar with the facts of the case. So, in our division, most of the time we're going to spend in the 20 minutes is going to be answering your questions. So, before we go. Thank you, Your Honor. Thank you. Mr. Olson, you may proceed when ready. May it please the Court and may it please the people of Dalton who are here today. Because that is who Mr. Giaconetti, Mr. Sackler, Mr. Avery and I represent today. The 3,603 voters who heard the rhetoric and were able to read through the legal maneuvers up to three days prior to the election and went to the polls to approve the recall mechanism by 448 votes and the recall itself by 424 votes. Your Honors, we've heard much the last few days about the sovereign and the unfortunate loss in the UK and for the world. Here, however, in the United States, the people are sovereign and the people of the village of Dalton have spoken loud and clear. The Board of Trustees of Dalton and the village clerk who sit behind me today and who ran with the plaintiff on the same ticket just over a year ago saw fit, for obvious reasons to them and the people of Dalton, but not pertinent for our legal matters in this appeal here today. Mr. Olson, you can see, don't you, that for all the rhetoric that's in your brief about the rights of the voters, there is a legion of case law in Illinois where referendas changing the form of government have been struck down because they weren't done in the correct way. If there's anything you take out of the 1970 Constitutional Convention transcripts is that the people who wrote our Constitution, they were very intent on not having Illinois be California with referenda changing laws all over the place. So our Supreme Court, which we have to answer to, has struck down a lot of change of form of government referenda and there doesn't seem to be one like this out there. One of my questions in my list here is, is there an example of anybody who's been recalled from a local office in Illinois history? Excellent question. We searched and we looked and we could find none that have actually been recalled. There was a case, N. Ray Bower, which we cite from 1968 with the prior Constitution, where the Supreme Court took up the issue of the petitions that were filed, mostly regarding fraud. And the resolve of that case was that it was on the ballot, but quite frankly, I don't know the results. Mr. Olson, are you saying then that the mechanism that you have established in this case for recall is what we should be using going forward since you haven't found another one in state law? Yes, Your Honor. Because, and I'll get to it in my argument, but because the General Assembly hasn't acted in this area. There is no law about recall except for the governor's race, where they did react after Governor Bogoyevich went to prison. They then passed a statute allowing for a governor to be recalled. Other than that, we have nothing. So what happens when we have nothing? Home rule communities, like Dalton, can govern themselves and put questions on the ballot to change their form of government, change the manner of selection of their officers, change the terms of their officers through referendum only. Let me ask another question. How should that referendum originate? Should it originate with the people or should it originate with elected officials? What's the genesis for the origination of the referenda that ultimately ends up on the ballot? Two genesis. One, the Constitution, Article 7, Section 6F, allows a home rule municipality by referendum to change the manner of the way they run their government, basically. The election code under Article 28, specifically 28-7, allows referenda to be put on the ballot either through petition of the people, and there are certain number requirements, or by resolution of the governing board. So the General Assembly has allowed referenda to go on the ballot for a vote of the people in either of those manners. Now, interestingly, in addressing Justice Delors' comment about the framers of our Constitution in 1970 didn't want us to run wild like California and have all these referendum questions on the ballot, I agree, and they saw fit to do that by limiting three questions per election cycle on the ballot. Is that a statute rather than a Constitution? I don't remember. It's my statute. Okay. My statute, which has been tested in the Jones cases that we referred to in the United States District Court, where the United States District, the Seventh Circuit, found that the limitation of three per election cycle was legally... Counsel, can I ask you, how do you distinguish the Henyard 1 case, which says it should be an approved, pre-existing, voter-approved mechanism to be in place, before you can recall? It says pre-existing. Thank you, Justice Connors, and that is exactly the model we used to form the questions for the electorate in Dalton, using the Henyard, we call it the Henyard 1 case, as a framework as to how the questions should be on the ballot. In other words, providing the mechanism, and after the voters voted on the mechanism, then the actual recall. Well, the voters could have voted on the second one first, could they not? Then it wouldn't have been the first one. They could have. On the ballot, the mechanism was first, and then the recall was second on the ballot. Is that a crucial distinction? Does it have to be that way? I don't think so. I think it's the votes of the people. What is crucial, I think, in this case, is the way the second question, the recall mechanism, I'm sorry, the recall itself was structured, and that had the conditional if on it. If the first question was approved, then do you want to take the next step and remove the mayor from office? Are you asserting, you're the appellant, sir, you're asking us to undo what the circuit court did. Yes, sir. Are you asserting as a ground for reversal, the fact that the circuit court entered a final and appealable order disposing of everything in the case, without having an answer on file, or a motion for summary judgment, or a motion for judgment on the pleadings, or a trial, which are the four ways a plaintiff can win a case, and the plaintiff won the case here without having any of those four things happen? Much to our chagrin, that is exactly what happened, and we were left to file the emergency motion for stay, and then the appeal, would we rather have had the case come to this court in a fashionable manner? Mr. Ottelson, what's the remedy for that? I hate to cut you off, but that's what Justice DeLorte just said is basically the structure of how cases come to us. So what's the remedy for that? What are you asking us to do? I mean, assuming we have to write something that's coherent and makes sense, what are you asking us to do? So I'm asking you to do one of two things, because we make the latches argument at the end of our brief. We're asking you to reverse the circuit court's finding that the two questions were null and void. That was his finding. They're null and void. To reverse that, and based on the briefs, because we've given you all the law. This is not a fact case. This is a law case. The facts are not in dispute. The referenda are the referenda. How do we use a fact search in dispute if we don't have an answer? Okay? Counsel, let me ask you this. Wouldn't the remedy be to vacate rather than reverse and send it back for the circuit court to do what it was supposed to do, which is resolve the case with a trial or a dispositive motion? Yes, I can't say I disagree with you, Mr. Justice, except for the fact that we have given you all of the facts. And because it's an election case, and because it affects the people of Dalton, and because they have voted on these questions, I think it's within your power to decide the case on its merits because it is a legal intensifier. So, counsel, let me ask you this. Is it clear under Illinois law that if there's a request for injunctive relief, the court must have an answer to the complaint before the court can make a dispositive ruling? The court, as you know from reading the briefs, made no ruling as far as the request for injunctive relief. And when we went to court … Well, made a decision, at least. Let's say that. He decided on the ultimate question, were the questions, the referenda questions, unconstitutional, legal? He made no constitutional findings whatsoever. And we highlight that the findings were null and void. So the answer, Justice Connors, is because he didn't rule on the TRO and skipped over that and went right to the merits, I think it is still right for the appellate court to rule on the merits of the case and the substantive issue on the case, whether the two referenda were legal and could go on the balance sheet. Was there a request to ask the court to clarify that ruling as to what the basis was? The court was very adamant in making its ruling and ending the case. So that there was no disrespect for the court, we accepted, and because the election was six days away, we accepted that ruling and moved on to try to provide relief so the people of Dalton could vote. The legal underpinning of the complaint is that essentially you can't have both of these at the same time. Right. But can we sustain the first referendum establishing a recall system without invalidating the second one? I think it is within your purview to do that. I don't know how you will do that, but if you find that the second question should not have been on the same ballot as the first question, I think certainly it's within your powers to grant relief in approving the first question and directing the court to certify the results and leaving the second question to another day. However, however, and it was part of my argument, but I'll get to it right now. Mr. Obelson, sorry to interrupt you again. That's all right. This is kind of a sub-part to the question that Justice DeLorte asked. Isn't your contention that because of the specific order in which the referendum questions were placed on the ballot, that makes it okay? I mean, I think we've all agreed that the methodology has to come before the question. You have to have an established methodology before you can ask the ultimate question. And the way this is placed on the ballot, are you saying that because the recall mechanism was the first question and the removal question was the second, that satisfies whatever constitutional or statutory requirements are necessary? Yes, Your Honor. The order, and they were placed that way on purpose, the order is very important, but not as important as the wording of the second question, which is contingent with that word if, contingent on the passing of the first question. Because contrary to what the plaintiff argues, if the first mechanism question did not pass, it doesn't matter what happened on the second one. It fails because it's contingent on the passing of the first. And the Constitution, the statutes, the General Assembly have not caused an impediment for us to do that. We could find nothing that says that we cannot put those questions in that order, second question being contingent on the first question, on the ballot. Johnson versus Ames. There's many cases talking about complicated questions and how you have to be clear and not ambiguous and not vague, and we recite them all in the brief with Leck and with Lipinski and the cases that have found that the questions were vague and ambiguous, so we were very careful on behalf of the trustees to word the questions so the people can understand them. And that second question is pretty clear with that word if. So yes, the answer is yes, we think they both have a proper place on this ballot. Counsel, could there be any vagueness or confusion in the last sentence that reads, it may be submitted by the corporate authority or by petition? Do you think a voter understands that? We did that and we did that to, yes, I think they do, especially I can speak from the South Suburbs, they're very politically active and petitioning is part of our life and they understand what petitioning means and doing petitions and that's what the statute says. 28-7 of the 5-28-7 sets out the procedure where people can petition their government, whether it be the state or the municipality, by petition, by voter petition, filing a certain amount as required by statute or if the governing authorities think that they need a change in the form of government or any other way they do business. But did it say by the people or by the populace or anything like that to allow them to know who would file the petition? The question itself may be submitted either by resolution of the Dalton corporate authorities, refers right to them, or by petition in the manner prescribed by law for the submission of public questions. So the referendum portion of the election code prescribes how you submit petitions for public questions. Again, using the signature requirements based on the last governor's election. You know, before we wrap this part of it up, let me ask you about Lances. Yes. Yes. I think you claim as part of that argument, well, the mayor didn't veto the resolution. Yes. That's your argument, right? Part of it. Yes, sir. Under 642 of the municipal code, the mayor can't veto a resolution that doesn't expend money. So why are you making that argument? Was it even ever presented to the mayor for her signature? Because again, the same section of the municipal code does not provide that resolutions that don't spend money go to the mayor for signature. They appear to have become effective only by vote of the board. I'm familiar with that section, Your Honor. I can't say whether it was presented to her for signature or not. The clerk would have made it. And to make matters worse, the record that we have, such as it is, doesn't have a signed copy of the resolution or a certified copy of the resolution. It's a typed, fill-in-the-blank copy of the resolution that some of you are saying, well, this is what they passed. So we don't even have that in the record before us. And that's all we had because the mayor didn't sign, refused to sign the resolution. Along the way, no one could get a copy certified by the clerk. Actually, I thought we did have a copy certified. Maybe it is. I thought we did. But the mayor would not sign the resolution. This part of your lanches argument is the mayor waited too long to sue. What about all the case law that says that you don't get lanches against the public body? You've been talking about your voters. Well, there's 45 percent of the voters on the other side of the equation. Correct. So we have to recognize both sides' rights. And the lanches argument was brought up because of the great delay between the time we passed the resolution in December of 2021. And this court knows you only have to pass resolutions to put propositions on the ballot 79 days before the election. We passed it six months before the election in order to give the mayor time, in order to give the people time to educate themselves. Lanches is a fact-based kind of principle. So what's your best argument and your best case that lanches applies here? The best argument is what I just started to say. The law requires the corporate authorities to pass any resolutions prior to 79 days before the election. 79 days. These corporate authorities passed the resolutions six months prior to the election in December of 2021 in order to allow the mayor to take a look at it, do whatever she thought she wanted to do, and then educate the people. Or if she was going to file suit on some grounds, file a lawsuit. No, she waited, for whatever her reasons are, until April, the middle of April, to file a lawsuit, and then waited another month until May to file any type of petition before the court for relief. Counsel, let me ask you, was there a need for certification by the county clerk before they could proceed? Before? With a lawsuit? Was there a need for certification by the county clerk? If the county clerk did certify the- When was that, do you recall? Middle of April, sometime in April. And no, there was not a need for that. Once it passed the corporate body, once the time for vetoing or not vetoing the resolution passed, it was the law in the village of Dalton only to be placed on the ballot by the county clerk and certified. So the way to undo that law is to file a lawsuit or, as we argue, wait until the people have spoken and then test it. But the certification is of no consequence then? No consequence as to the timing of her waiting from December until April. It's of consequence because that's the way something ultimately gets on the ballot After the governing bodies of the local municipality pass it, it then goes through the channel for the clerk to certify it. You're over time, but let's give you about two minutes to wrap up. And then you get five more minutes at the end to respond to what Mr. Casper tells us. The ultimate point, the ultimate point is that we have found no prohibition to put these two questions on the ballot. Not in the Constitution, not in the state statutes, not through the General Assembly. Home rule is literally construed. The framers of our 1970 Constitution were clear on that. And there's very good case law that we've cited on that. The corporate authorities of the village of Dalton can govern themselves or ask the people how they want to be governed. They did, and the people spoke. One year after they put the mayor into office, they voted to take her out. A thousand more people turned out for this election than the mayoral election a year prior. That speaks volumes. This is about self-government. Isn't this sort of typical for a primary verse in an even-numbered year versus an odd-numbered year at all? Well, the municipal election for mayors are usually pretty good turnouts when there's contests. Primaries of late, not so much. So we feel this is a crucial, crucial case. I was going to thank you before you started asking questions, but I wanted to thank you for allowing the oral argument and for coming here and allowing us to present in front of you. It's good to be back in the courtroom before justices. Thank you. You queued me for something I had written down, but I didn't say, Mr. Olson, which was, this is the first argument we've had in person since COVID. Wow. The 5th Division is back up and running in person. We have another argument next week, and we'll be continuing, at least for this division. And we would, the attorneys lined up on this case certainly are very active in the appellate bar. Yes. And we would ask you to maybe spread the word about that if you are expecting any large crowd of members of the public, which we welcome, let the clerk's office know ahead of time, because we can always move to the bigger courtroom. Oh, that's very good. So just keep that in mind. Neither the public or some of the lawyers here are used to coming before the bench, so it's a welcome relief to be back. Thank you, Your Honor. Mr. Kasper, you may proceed when ready. Okay. Thank you, Your Honor. Your Honors, good afternoon. May it please the Court. Michael Kasper on behalf of the appellee, Mayor Tiffany Heno. I agree with the comment from Justice Connors during Mr. Olson's presentation that this case turns largely on interpretation of this Court's previous decision in the case that we've all been calling Henyard 1. Henyard 1 involves the constitutionality of a referenda question, an ordinance allowing a referenda question, to recall elected officials in the same municipality of Dalton. In rendering this decision in striking down the ordinance empowering the referenda, this Court said, quote, the recall procedure specified in the ordinance required prior approval by referenda, close quote. This Court went on in the same paragraph, this is paragraph 25 of the decision to say, quote, consequently prior approval through a referendum of the recall procedure specified in the ordinance was required, close quote. So twice in Henyard 1 this Court said prior approval of the referenda or the recall procedure was necessary, prior approval, which begs the obvious question. Mr. Kasper, what do you say to your opponent's argument that by placing the referenda questions in the order in which they're placed, specifically requiring the methodology to be approved by the voters before they got to question 2, which would speak to removal, that that satisfies the requirement? What do you say to that? I don't think that that's supported by the law at all for two separate reasons. The first reason is that on its face, the recall mechanism, the first question, provides that it would have become effective only upon certification of the results of the primary election. Primary election, of course, was June 28th, and in the weeks leading up to that through early voting, vote by mail, all of that, the results of the primary election were certified on July 19th by the county clerk. So the recall procedure did not exist until July 19th by its own terms. That's completely consistent. And the reason why they put that in there is because of the Supreme Court's decision in the Jones case last year that we cite in our papers that stands for the proposition that the results of a referenda cannot become effective until they're certified by the election authority, in this case, the county clerk. So the recall mechanism did not exist until July 19th. The question to recall the mayor was given to the voters on June 28th. The cart came before the horse. Even the appellants conceded they must have a mechanism to provide for the recall. Otherwise, they wouldn't have put the first question on the ballot in the first place. Why do you need the first question? When does the recall become effective? When is the removal effective? How is the successor chosen? Those are pieces of information that are necessary, as they concede. But I don't think they can put both questions on the same ballot because of what this court said in Henry. Prior approval was necessary. Prior to what? That begs the question. Prior to there being a process by which an elected official could be recalled. So I think that the fact that they put them on the same ballot renders both of them unconstitutional. Let me ask you the same question I asked your opponent, which is, you know, Correct. You won. Correct. Basically, four ways a plaintiff can win a lawsuit. Trial, a default with approval, summary judgment, or judgment on the pleadings. Which of the four did you win? How did you win? Well, here's how I won. It's interesting. I agree, the posture in this case is a little bit uneven. It seems to be floating above the codicil procedure in the Supreme Court rules. The rules according to the 17th floor of the Daily Center. But how do we review the order, which is a final and appealable order disposing of all the issues in the case, which had no procedural basis to back it up? The process that happened, here's what I can tell you about this, about what happened below. The complaint was filed. The plaintiff moved for a temporary restraining order. There was some briefing, some argument about that. It was entered and vacated. Yeah, it was entered and vacated. Then there was an argument about it on June the 15th. We had an argument. The judge ruled, Judge Karkula ruled, in favor of the plaintiff. During that hearing, the appellant's counsel said, we would like to take an interlocutory appeal. The judge said, fine, do whatever you think is necessary. Later, but you can do a TRO. Correct. But at the end, there was no TRO. At the end, then, at a subsequent conference with the judge, before the entry of the written order, as I recall it, the appellant asked that he convert that to a final appealable order so that they could go to the appellate court. And he agreed to do it. That's what happened. And I think there was 304A language. Yes, correct. This is all found on page 48 of the supplemental record that was filed with your court. So then how do we review this? Well, that's a good question. I think that assuming that you accept at face value the appellant's request to convert the TRO into a final appealable order, then I think you just review it in the ordinary course. Otherwise, I believe the appropriate remedy would be to remand for a determination to be made, as you set forth earlier. Counsel, can I ask you, what did the trial court base its null and void ruling on? What was the basis for that? I presume it was based on the arguments that were set forth in the papers that both sides filed. There was extensive briefing. And we had a fairly lengthy hearing talking about the various narrative cases. I understand that. But often that is very helpful for the appellate court if there's a record of what the court relied on in making its ruling, but this court did not, correct? Well, the court issued it, as the courts do often in these elections, you rule from the bench and then the order reflects for the reasons stated in open court. And did he talk about? Certainly not for either side to tell the judge what to say. Did he talk about injunctive relief when he went through his reasons for his ruling to see if that was satisfied? I don't recall the specifics of how he did give a fairly lengthy oral ruling from the bench regarding that, but whether or not he ticked off the various elements of the TRO, I don't recall. And, Mr. Casper, you know, again, the underpinning of this case is that you can't have the first, I mean, you can't have the second without the first already having been canvassed and having the force of law, correct? Correct. That's your argument? That's our argument, correct. And your opponent makes an analogy to some statutes about bond issues. You know, you create a new governmental body and elect the board at the same time. I mean, that's by statute. What is your best case for the proposition that you're asserting here? Is it Henriot 1? Yes, absolutely. Absolutely, Henriot 1. For sure. The quotes that I read, prior approval was necessary. So I believe that that's correct, that the horse has to come before the cart. There has to be a horse before you can have a cart. In Henriot 1, this court said prior approval. It didn't say prior or simultaneous approval. It said prior approval. Or it could have just left out the word prior. In this case, you know, as I recall on Henriot 1, okay, the problem was that there was never a referendum. Right? It was just we're going to have an ordinance creating a recall system. Correct. Because we're so powerful, we're just going to do it when no one bothered with the Constitution that says you can't do this. Right? Correct. Okay. Without a referendum. And here they said, well, all right, let's fix this and do the referendum. Correct. Okay. But I think that you have to do a referendum. That's true. But you have to do it before you do the recall. There's two elements, not just one. And they read the word prior right out of this court's decision in Henriot 1. They filed 70 pages of briefing in this case, 70 pages without once talking about that sentence and the meaning of the word prior. Not once. And so that's the fatal flaw. That's why you can't do both of them at the same time. Counsel, what about your opponent's argument that the election code doesn't prohibit this type of activity, having them both on the same ballot? Well, I think that this court's ruling in Henriot 1 addresses that. That's what establishes the requirement that the mechanism precede the recall itself. And, Justice DeLoy, you asked the question, can the first question stand in the absence of the second question? If you agree with us that the first question had to come prior to, could you uphold the first one and invalidate the second one? In other words, could you save the recall itself for another day? And the answer is, in certain circumstances, the answer is yes. I believe you can. This court has issued two rulings on this question, Williamson v. Doyle in 1981. It said there was no authority to provide for recall. And then Henriot 1, which seemed to go in the opposite direction, said under certain circumstances you could. This mechanism, though, has not had circumstances. Is it your position that this court cannot sustain the first referendum? Yes. Okay. And here's why. Just tell us why. Three reasons. The first reason is that it is created, it begins in the middle of the mayor's existing term. The voters elected the mayor last year as Mr. Olsen to a four-year term with 82 percent of the vote. Landslide victory. Is this a Tully v. Edgar Arnett? Yes. Yes. It's the Tully Doctrine, which stands for the proposition that when an elected official is elected to a term of office, the voters, not the elected officials, the voters are entitled to the product of that vote and are entitled to have that elected official serve the term to which they elected them. In this case, the voters of Dalton elected Mayor Henriot to a four-year term with no possibility for recall. Those were the rules in place at the time of her election. The village board, by passing these resolutions, is changing the rules in the middle of the game. And that, I do think, is unconstitutionally impermissible under the Tully Doctrine. But Tully dealt with the state legislature ousting elected officials in the middle of their term just because the state legislature wanted to. Correct. And converting it from an elected position to appointed by the governor. Correct. We don't have that here because we still have the mayor being elected by the governor. There were two problems in Tully. First is the legislature removed the U of I trustees in the middle of their terms. So there were two problems. One, it was legislative action. And two, that it was in the middle of their terms. The legislature subsequently passed another law converting the positions from elected to appointed. So the real problem, and that, of course, is the law today. We still don't elect U of I trustees. The real problem is that it was in the middle of the term. That was the constitutional defeat. So that was your first reason of three. What are the other two? But there must be some exceptions to that rule, though, is there not? There's got to be some exceptions to that rule. No matter what, that person stays in office for the full term, no matter what they do? I think, no, I think that the exception to that is if there is a process by which they can be removed in place at the beginning of their term. That's the key. So that the recall of the governor, the governor whoever wins this next election and is governor is subject to recall. I think that the governor, if the legislature put a question on the ballot in the middle of the term, allowing for that person to be recalled, then they would have a good argument that that would be unconstitutional. Even for malfeasance? Well, today in VidCon, there's an impeachment process. But that pre-exists the term. So I think the rules have to be in place. And there's a rule that if someone's convicted or charged with a crime, you can forfeit the office, those types of things. So, Mr. Casper, if I understand your argument, because this referendum question was posed after her term began, it could apply to the next mayor, but not to her? I think that the proper way for the village board to do this was to pass a resolution that said, effective at the beginning of the next term, the mayor could be recalled. Yes. But I'm not sure you answered Justice Cunningham's question. Okay. I thought I did. She does this to me, too. Okay. It was, can, you know, can they do the first without the second? I mean, you're saying it can only be effective for a subsequent term. Correct. And therefore, the first one under your position is just invalid on its face for not limiting itself to be effective as to a subsequent term. That's one of the reasons. Okay. That's the totally documented reason. The second reason is why this mechanism fails is because it violates separation of powers. Separation of powers, one of the bedrock principles of our democracy, exists for a lot of reasons. The appellants in their briefs talk about one of the reasons, that one branch should not usurp or exercise the powers of another branch. But there's a second reason that's just as important. It's to protect each branch from the coercive influence or undue control of another branch. That's the Jorgensen case that I cited in my brief. In Jorgensen, the executive refused to pay judges part of their salaries. The executive wasn't trying to perform judicial functions. The executive was refusing to perform its own function. And the court ordered the executive to pay the judges their full salaries to protect the independence of the judiciary. In this case, what is most striking about this scheme, this recall scheme that the board created, is it allows the legislature to place a recall question on the ballot itself with no citizen participation. The first time that I have found in the history of our nation that that's ever occurred. Every other recall system that I have, they point to all these states that have all of these recall provisions. Every one that I've found requires some citizen initiative. The only office in Illinois that's subject to recall is the governor. The legislature would be like allowing the General Assembly to place the recall question on the ballot against the governor. Instead, the citizens have to file for the governor hundreds of thousands of signatures to place the question on the ballot. And that question can only be placed on the ballot once during the governor's term. Just once. In this case, the legislature could put this question on the ballot at every single election. That's six elections during the mayor's term. Imagine the coercive influence of that. Do this, or we're going to place the recall question on the ballot. Approve this ordinance, or we're going to place the recall question on the ballot to see if we can get them to fight. Approve this pay raise for my ward superintendent. Do this, do that. Hire my nephew. So, Mr. Casper, one of your complaints about this is the manner in which the referendum question came to be. You know, I assume it was drafted by somebody on behalf of the village trustees, and that's your concern or your complaint? I don't know who created it, but how it came to be isn't really a concern of ours. I think the question is really is the way it works, the way it would work. It allows, by allowing the legislature, for the first time that I'm aware of in the history of our nation, to place a recall question directly on the ballot with no citizen participation. So that's the second reason. You're talking about the recall of a specific named individual. That's your position, right? Yeah. The named incumbent. Yes, the office. Correct. Is there a special case on that, or it's so well known we don't need to have a case on that? I was unable to find a single example of any state, municipality, county that's ever proposed. Yeah. I mean, we've seen California as an example. Yeah, there was some discussion in District Attorney San Francisco recently that those were citizen-initiated. Correct. And getting to this question of starting at the beginning of the term, California's had recall for over 100 years. Wisconsin, there was a citation in the appellant's brief. They've had recall for almost 100 years. And regarding quickly, I think that the third reason, although this is not why the two, I think this is why the two fell together again, is this question of being vague and ambiguous. And I think that putting both questions on the ballot creates a dangerous precedent. And it didn't happen in this case, but it might happen in the next case where the first question fails, but the second question passes. And Mr. Olson points out to the lawyerly language in the resolution, if and only if this happens, but I'm not sure the average voter understands that. What if the recall passes, but the mechanism fails? The average voter's going to think, wait a minute, it passed, but it failed? We voted her out of office, but she's still in office? Well, that didn't happen. But it could happen in the next case. You know, and that's something that I also wonder about. We voted her out, but she's still in? And as for laches, I think I agree with you, Mr. DeLorde, or Justice DeLorde, I'm sorry. I think that this was passed by resolution. And so I don't think the mayor has the authority to veto it, so I don't think that matters at all. And because it was passed by resolution, up until the time the county clerk certified the question to be on the ballot, they could have withdrawn it. They could have just simply withdrawn the question. But the county clerk certified the question to be on the ballot on April 21st. The mayor filed her complaint four days later. How on earth is that delayed? The question was not officially on the ballot until April 21st. She filed her complaint four days later. So I don't think there's any undue delay at all. The case on that is McCunn v. Williams. Let's answer that proposition. We'll give you a couple moments. Yeah, just a couple of more things. And the final argument, of course, the second element of prejudice is, I would allege that Laplacius is prejudiced to the opposing party. And there's certainly no prejudice alleged by the opponents to them. They talk about some inconveniences to the clerk in that. But obviously the clerk was able to pull off the election. Perhaps we would have been better served if they had had more trouble with the election, given the way it turned out. But that's all I have to say. For those reasons, we believe that the decision, the ultimate decision of the circuit court was correct, that the inclusion of both questions on the ballot violates the very specific language requiring prior approval of the recall procedure, which means that you can't do both at the same time. And for the reasons I've said, I think that the recall mechanism itself also fails. So unless there's any other questions. Any other questions from the panel? No. Thank you, Mr. Kastner. Thank you, Mr. Olson. Your Honors, just briefly, Tully is about legislative action thwarting the will of the people and interrupting a term. That's all Tully's about. You cannot pass legislation to cut off someone's term. It has to be done by the people who put you into that office, which is what recall is all about. Number two, counsel talks about the proper way. I talk about the way of the law. What does the Constitution and the statutes tell us that we should do and can do? And what did Hengard say? Hengard one, the trial court declared the village board's attempt to enact recall solely by ordinance was unconstitutional because the village was required to submit the issue to a voter referendum prior to enactment of the ordinance, not prior to the term of office. That's very artful, but not the law. That's not what Hengard said. You have to have something voted on by the people, not by the legislative branch of the government. There was, in 2010, the village of Buffalo Grove did recall a trustee. There was no court case on it because they put it on the ballot, the people voted for it, and the trustee was removed. That is, it's not a case. It's something that happened. Do we know if it was grounded in some sort of prior Article VII referendum? No. Stable procedure? No. It was not. It was not. It was not, which, again, I think, and maybe it's just me, I think you could put the recall of the mayor on the ballot without a mechanism. I think you could just say, show the mayor be recalled. Why do I say that? Because there's nothing in the Constitution or the statutes or the General Assembly that forbids it. And we're home rule. And we didn't do it, we being the trustees, the people did. Well, under that analysis, though, Mr. Olson, all right, you could have the village board could pass a referendum saying, shall the village board, you know, you have 32 members, okay? No, that's a change in funding. You know, they're certified in auction. That doesn't exist under the present established practice. Right. I mean, I guess there is some problems with it. But, again, looking strictly at the Constitution, what 6F gives us, and looking at the statutes, the election code and the municipal code, I didn't see a prohibition to putting recall on the ballot by itself. However, we kind of we followed the lead in Henry I, put the mechanism on, followed it up, and to answer Mr. Casper, there was no confusion, and there will never be confusion when you say, shall the mayor be recalled or shall the board be recalled if that was there. That's why we put the mechanism on. So we did it to the letter of the Henry case and the letter of the law according to the Constitution and the statutes. Counsel, can you address the separation of powers issues that was discussed by Mr. Casper? Yeah, I can. I don't quite understand it, to tell you the truth, because the legislative branch is entitled to pass legislation, which they did by putting a referendum on the ballot, to give the people the opportunity to vote on the legislation. The executive does what they do, and in this case maybe they can't veto, as Justice Gillard said, but the executive has his or her power too. So there was no intrusion by the legislative branch to the executive branch. It was an inclusion of the people. They didn't make the decision to remove her from the office, the people did. But the presenting of it, wouldn't that cause a little bit of chaos if a legislature could do that at any time? I'm sorry, do what? If a legislature could propose removal at any time. Would it present chaos? Counsel argues that this could happen five or six times during someone's tenure. Could it? Yes, it could. Would the people abide by it, adhere to it, appreciate it? The answer is no. How do you know that? It doesn't happen so many times. How do you know that? Well, I know that because we don't even have recall in Illinois. And I should mention this. Thank you for asking. There was a bill proposed two years ago, or a year ago, in March of 2021, limiting recall. It's in committee. It's dead in committee. So there is no state statute. However, contrary to that, term limits, which has become a big thing, both statewide and locally more, term limits was passed in Calumet City by referendum. And then the General Assembly acted to reverse the rule of the people in regards to term limits. And they did pass legislation, which is good and on the books now, saying term limits can only be done in a certain manner. So the General Assembly has an opportunity to act. And here the people act. One last thing. The school code allows for removal of board members. The election code allows and calls for a vacancy to be created when someone is removed from office. The election code itself doesn't speak to how that person is removed from office. It just has the one sentence that a vacancy exists if someone is removed from office. So I desperately do not want this case to go back because it will cause undue delay in the functioning of government either way, which is why our brief was so extensive, to make sure that this panel had all the legal criteria to make this decision. We did ask the judge to reconsider and to stay his order. He denied that, which allowed, of course, was the first step in us getting to this court, which, again, I thank this court for allowing the people to vote. Thank you, Your Honors. It's been a pleasure. Thank you. Thank all parties involved for the excellent, thorough briefs which we have received. As is our practice, the court will take the matter under advisement and you will receive a written ruling in due course. We would also remind you that the tape recording of today's arguments will be available on the court's website within the next 24 hours, if not earlier. With that, the court will stand adjourned. Thank you.